IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  06-cv-01856-WYD-BNB

RIPPLE RESORT MEDIA, INC.,

     Plaintiff(s),

v.

SKIVIEW CORPORATION,

     Defendant(s).

---

FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

THIS MATTER is before the Court on a trial to the Court held on July 14, 15, and 16, 2008.  After considering the testimony of the witnesses, the credibility of the witnesses, the exhibits submitted, and the arguments of counsel, I enter the following Findings of Fact and Conclusions of Law:

1. Plaintiff Ripple Resort Media, Inc. ("Ripple") is an Indiana corporation doing business in Colorado.

2. SkiView Corporation ("SkiView") is a Delaware corporation.

3. The Court has jurisdiction pursuant to diversity of citizenship pursuant to 28 U.S.C. § 1332.

4. Matt Jay owns the patent on a product known as "Maplinks," which Mr. Jay markets through his company, Ripple.  Maplinks are display devices that attach to bars on ski chair lifts.  The Maplinks display holds a map of the ski mountain, allowing skiers to select their next ski run while they ride up on the lift.

5. SkiView is engaged in the business of selling advertising at ski resorts.

6. On May 31, 2005, Ripple and SkiView entered into an agreement known as the Sales Agency Agreement (the "Agreement"). The Agreement granted SkiView the right to sell Maplinks advertising space for a period of up to three years.

7. The Agreement commenced on May 31, 2005 and was scheduled to terminate on May 1, 2008.

8. Under the Agreement, SkiView would be the exclusive seller of Maplinks advertising space (Ripple retained the right to sell advertising space) for the term of the Agreement so long as SkiView continued to make the minimum annual purchases.

9. The advertising space on the placards made by Ripple was referred to as "promotional spaces"

10. The Agreement required SkiView to purchase a minimum number of promotional spaces each year at an agreed upon price schedule. Specifically, the Agreement contemplates that Ripple would receive guaranteed minimum payments of:

- 2005: $103,563.00 (333 chairs at $300.00 each plus $11.00 each for production costs.)

- 2006: $207,126.00 (666 chairs at $300.00 each plus $11.00 each for production costs.)

- 2007: $310,689.00 (999 chairs at $300.00 each plus $11.00 each for production costs).

11. The Agreement provided SkiView with an exclusive right to purchase at least 20% of Ripple's inventory of Maplink cards.

12.     In addition to the payment schedule for the minimum number of promotional spaces, production costs ($11.00 each) for all Maplink cards purchased out of inventory were due on November 1st of each year and that two one-hundred-fifty dollar ($150.00) payments for each Maplink card were to be paid on November 15th and the following February 15th.

13. In the 2005-2006 ski season, SkiView committed to purchase more than the minimum number of chairs that it was required to purchase under the Contract.  SkiView purchased a minimum buy of 333 chairs, and bought an additional 517 chairs out of inventory.

14.  I find that on January 24, 2006, SkiView owed Ripple the total sum of $186,800.00 for both the minimum number of cards purchased (333) under the Agreement as well as the additional inventory cards purchased (517).  SkiView had previously paid the sum of $36,800 to Ripple, leaving a balance due of $150,000.00.

15.  I find that as of June 7, 2006, SkiView had issued payments to Ripple totaling $264,980.00; representing all monies due and owing under the Agreement.

16.  I further find that the parties to the Agreement agreed to (and acted in accordance with) the handwritten alteration of the Agreement pursuant to Section 9(b) that provided for a sixty day cure period subsequent to written notice to cure a material breach.

17.  Accordingly, the termination provisions of the Agreement allowed either party the right to terminate the Agreement for cause upon the failure of the other party to cure a material breach within sixty days of written notice to the defaulting party of a default.

18. I find that the evidence shows that on January 24, 2006, Ripple issued, by electronic mail, a demand for payment of monies under the Agreement.

19. Though Defendant asserted at trial that the manner of the notice of default did not comply with the specific notice requirements of Section 10(e) in the Agreement, I find that the January 24, 2006 e-mail was a notice of default and was treated as such by SkiView.

20. The testimony and evidence produced at trial show that, before the expiration of the sixty day cure period, SkiView had paid, and Ripple had received, monies in excess of the amounts necessary to cure the notice of default sent by e-mail on January 24, 2006. Ripple's principal and owner, Matt Jay, testified that SkiView owed Ripple $150,000.00 as of the January 24, 2006 notice of default and that, by March 25, 2006, SkiView had paid Ripple $160,000.00 which was $10,000.00 more than was necessary to cure the January 24, 2006 notice of default.

21. Ripple did not provide any further notices of default for monies owed under the Agreement after the January 24, 2006 e-mail notice.

22. Further, I find that the testimony and documentary evidence produced at trial establishes that SkiView continued to make, and Ripple continued to accept, payments to Ripple under the Agreement until June 7, 2006.

23. SkiView had tendered for payment to Ripple a total sum of $264,980.00, including payments of approximately $160,787.00, which additional amounts were owed to Ripple as a result of SkiView's sale of chairs in excess of the minimum requirements under the Agreement.

4

24. A party has the burden of proof to establish its case by a preponderance of the evidence. Colo. Rev. Stat. 13-25-127(1).

25. "It has long been the law in Colorado that a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff." *Western Dist. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)(internal citations omitted).

26. In order for there to be an actionable breach of contract by SkiView, the breach must be material. Moreover, the Agreement required the parties to provide a breaching party with notice of the material breach and the opportunity to cure the alleged material breach before the Agreement could be terminated.

27. Ripple terminated the Agreement with SkiView by letter dated June 8, 2006. Ripple stated in that letter that the basis for terminating the Agreement was that SkiView had not made the required payments within sixty days after receipt of the January 24, 2006 notice of default.

28. I find that SkiView had cured any default alleged in the January 24, 2006 e-mail by paying Ripple the monies claimed owed in that e-mail within the sixty day cure period under the Agreement.

29. As such, I find that the evidence demonstrates that SkiView was not in material breach of the Agreement for alleged failure to make timely payments.

30. Accordingly, I find that the June 8, 2006 notice of termination was wrongful

as Section 9(b) of the Agreement provided the Agreement could only be terminated

after a valid notice of default was tendered to the breaching party and the breaching

party had failed to cure to the default within the requisite sixty (60) day cure period.

See, e.g., *Denver Ventures, Inc. v. Arlington Lane Corp.*, 646 P.2d 955, 958 (Colo. App.

1982)(cert. denied)("a court must enforce a contract as written"); see also, *Century*

*Enterprises, Inc. v. Blair*, 429 P.2d 291, 292-293 (Colo. 1967)(en banc).

31. At trial, Ripple claimed that SkiView was in further breach of the Agreement

when it failed to receive appropriate approval for advertising and promotional materials,

and when SkiView failed to remove unapproved promotional and advertising materials

from its website.

32. First and foremost, if there were any further breaches of the Agreement in

regard to the use of promotional and advertising materials, Ripple never provided

SkiView with notice of these alleged defaults, with an opportunity to cure, prior to

terminating the Agreement on June 8, 2006.

33. Ripple sent an email to SkiView on May 3, 2006, which requested that

SkiView remove certain promotional and advertising materials from its website. See

Plaintiff's Exhibit 35. I find that, even if the May 3, 2006 email was a proper notice of

default invoking the termination provisions of the parties' Agreement, SkiView was not

given sufficient time to cure the alleged default set forth in the May 3, 2006 email before

the June 8, 2006 wrongful termination by Ripple. *Denver Ventures*, 646 P.2d at 958;

see also, *Century Enterprises*, 429 P.2d at 292-293.

34. Moreover, "[w]hether there has been a material breach of contract turns

upon the importance or seriousness of the breach and the likelihood that the injured party nonetheless received, or will receive, substantial performance under the contract." *Interbank Invs., L.L.C. v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1228 (Colo. App. 2000). "[A] breach that is material goes to the root of the matter or essence of the contract . . . and renders substantial performance under the contract impossible." Id. at 1229 (internal citations omitted); see also 17A Am. Jur. 2d Contracts §706 (a material breach "must relate to a matter of vital importance, go to the essence of the contract, or defeat an essential purpose of the contract.")

35.   Even if SkiView did not timely remove certain advertising or promotional materials from its website, or did not seek permission in advance of the publication of certain advertising or promotional materials, I find that the testimony and the evidence produced at trial demonstrate that these alleged breaches of the Agreement were immaterial.

36.   In addition, the testimony and evidence produced at trial show that Ripple did not base its June 8, 2006 termination on SkiView's failure to remove advertising or promotional materials from its website or any other misuse of advertising or promotional materials.  The letter itself makes no reference to any alleged default or breach of the Agreement as a result of the unauthorized use of advertising or promotional materials. See Defendant's Exhibit A-3.  This conclusion is further supported by the testimony of the parties at trial.

37.   Accordingly, given the factual findings above, Ripple has failed to prove that SkiView breached the terms of the Agreement.

38.  Moreover, as SkiView was in substantial compliance with the terms of the Agreement, I find that SkiView has carried its burden in proving that Ripple breached the Agreement on June 8, 2006 when it wrongfully terminated the Agreement.

39.  As the evidence produced at trial demonstrates that Ripple's termination of the Agreement was without just cause, SkiView has shown that Ripple breached the Agreement by a preponderance of the evidence.

40.  Ripple's breach of contract deprived SkiView of future revenue which SkiView would have received in years two and three of the Agreement had it been honored.

41.  To support a claim for damages based upon lost profits, a party must first establish the fact of damages by a preponderance of the evidence.  *Pomeranz v. McDonald's Corp*, 843 P.2d 1378, 1382 (Colo. 1993);  *Tull v. Gundersons, Inc.*, 709 P.2d 940, 943-944 (Colo. 1985).

42.  Once the fact of damage is established, the factfinder must determine damages from the evidence available to it.  *Logixx Automation, Inc. v. Lawrence Michels Family Trust*, 56 P.3d 1224, 1228 (Colo. App. 2002); *B.B. Peterson v. Colorado Potato Flake & Mfg. Co.*, 435 P.2d 237, 239-240 (Colo. 1967).

43.  "However, despite difficulty or even uncertainty in ascertaining damages with mathematical precision, the trier of fact must, by utilizing all the evidence and the reasonable inferences therefrom, devise a fair method for assessing such damages".  *Logixx*, 56 P.3d at 1228; *Cope v. Vermeer Sales and Serv. of Colorado, Inc.*, 650 P.2d 1307, 1309 (Colo. App. 1982); see also, *Republic Nat. Life Ins. Co. v. Red Lion Homes,*

*Inc.*, 704 F.2d 484, 489 (10th Cir. 1983)   In other words, recovery of uncertain and speculative damages is precluded where the fact of damages is uncertain, but not where amount is uncertain.  *Peterson*, 435 P.2d at 239.

44.  Lost profits should not be based upon evidence which is speculative, remote, imaginary, or impossible of ascertainment.  *Lee v. Durango Music*, 355 P.2d 1083, 1087 (Colo. 1960).

45.  "Although damages may not be calculable with mathematical exactitude, so long as plaintiff introduces some evidence which is sufficient to allow a reasonable estimate of damages, it is incumbent upon the trier of fact to determine a monetary award which will adequately compensate the plaintiff."  *Great West Food Packers, Inc. v. Longmont Foods Co., Inc.*, 636 P.2d 1331, 1333 (Colo. App. 1981);  see also *Peterson*, 435 P.2d at 239-240 (trier of fact should calculate damages based upon the available evidence);  *Logixx*, 56 P.3d at 1227 (it is sufficient for plaintiff to provide a reasonable basis for computation of lost profits, "using the best evidence obtainable under the circumstances that will enable the trier of fact to arrive at a fairly approximate estimate of the loss.")

46.  A lack of historical information regarding profits does not preclude the recovery of lost profits. *Cope*, 650 P.2d at 1309;  see also *Miami Int'l Realty Co. v. Paynter*, 841 F.2d 348, 351 (10th Cir. 1988);  *Logixx*, 56 P.3d at 1227;  *Western Cities Broadcasting, Inc. v. Schueller*, 849 P.2d 44, 49-50 (Colo. 1993).  The testimony and evidence produced at trial establishes that for the second year under the Agreement, SkiView had already undertaken sales efforts and initiated negotiations with a number

of national advertisers in attempts to secure more advertising for the Maplinks product for the upcoming ski season.

47.  I further find that the testimony and evidence produced at trial indicates that SkiView developed and nurtured relationships with advertisers, such as American Express, Nature Valley, Aveeno, that would have actually resulted in advertising contracts for Ripple during years two and three of the Agreement if Ripple had not wrongfully terminated the Agreement.  See Defendant's Exhibit B-24 (Exhibit A thereto); Defendant's Exhibit B-25.

48.  Given these facts, the I find that SkiView has established, by a preponderance of the evidence,  the fact that it suffered lost profits by the wrongful termination of the Agreement by Ripple.

49.  In regard to the amount of lost profits suffered by SkiView, SkiView offered its CFO and a shareholder, Mr. Robert Blinn, as both a fact witness and an expert witness in regard to the lost profits suffered by SkiView as a result of the wrongful termination of the Agreement.

50.  While certain of the expert testimony offered by Mr. Blinn was speculative in nature, I find that there is sufficient fact and expert testimony from Mr. Blinn at trial, which is supported by documentary evidence, from which I can reasonably estimate the amount of lost profits as a result of Ripple's breach of the Agreement.

51.  I find that the testimony and evidence at trial establishes that there is minimal  historical information upon which to calculate an exact determination of SkiView's lost profits in this case, but that does not preclude me from making a

determination of the reasonable lost profits suffered by SkiView for years two and three of the Agreement as a result of Ripple's wrongful termination.

52.  I also find that there is no one particular methodology that can be employed to determine lost profits.  Both parties' experts offered testimony at trial that a calculation of lost profits depends on the particular facts and circumstances of the case.

53.  Mr. Blinn's July 11, 2008 report analyzes the actual historical results of Ripple's sales to advertisers secured by SkiView (American Express, Aveeno, and Nature Valley) in years two and three of the Agreement, after Ripple breached the Agreement.  Defendant's Exhibit B-25.  Mr. Blinn offered testimony at trial regarding the calculations in the July 11, 2008 report that are based upon Ripple's actual historic sales results to these customers secured by SkiView.

54.  Mr. Blinn's calculations assume lost profits based upon the actual sales to customers originally secured by SkiView achieved in the second and third years of the Agreement by Ripple.  Id.  The actual sales numbers achieved by Ripple in years two and three after it had terminated the Agreement were disclosed to SkiView by Ripple a week before trial in its Fourth Amended Responses to Defendant's Initial Discovery Requests.  See  Defendant's Exhibit B-24 (Exhibit A thereto).

55.  Mr. Blinn calculated lost profits for year two based upon SkiView's share of revenues of $199 per chair, which is the base amount set forth in the Agreement.  Mr. Blinn calculated lost profits for year three of the Agreement based upon SkiView's share of revenues of $249 per chair, which increase is accounted for by the testimony of witnesses and evidence produced at trial that, at the end of year one, Ripple increased

the sales price to advertisers from $600 per chair to $750 per chair.  See Defendant's

Exhibit B-25; Defendant's Exhibit A-40;  Defendant's Exhibit B-11 ("The list rate is

750.00 Per map.")

56.  Applying the actual historic results achieved by Ripple, the evidence shows

that SkiView's share of the sales achieved by Ripple to customers originally secured by

SkiView in year two of the Agreement would have been $194,025.00, based upon

revenues of $199 per chair for SkiView.  Defendant's Exhibit B-25.

57.  Applying the actual historic results achieved by Ripple, the evidence shows

that SkiView's share of the sales achieved by Ripple to customers originally secured by

SkiView in year three of the Agreement would have been $282,615.00, based upon

revenues of $249 per chair for SkiView.  Id.

58.  I also find, based on the evidence and testimony introduced at trial, that

SkiView did not prove that SkiView's sales efforts regarding BMW and Tuaca resulted in

Ripple entering into advertising contracts with BMW and Tuaca for year three of the

Agreement.

59.  Accordingly, under these circumstances, I find that it is not reasonable to

award SkiView lost profits from the contracts that Ripple eventually entered into with

BMW and Tuaca.

60.  The testimony at trial demonstrates that Ripple had a sales force of one

person, with limited experience selling advertising to local or national accounts and

whose sales efforts were performed on a part-time basis.  On the other hand, the

testimony at trial demonstrates that SkiView had a highly experienced sales force, with

contacts at a number of national advertisers.

61.    There is ample testimony and other evidence in the record that SkiView had

a sales force capable of continuing and expanding sales of the Maplinks advertising

product.  SkiView's primary business was ski advertising and it had a number of national

advertising accounts that it communicated with regarding placing SkiView's products

advertising at the 110 mountains on which it agreements to place advertising.  Jim Blinn

had contacts and experience from over 23 years in the advertising business.

Defendant's Exhibit A-95.  Its other salesperson, Mr. Bill McKissock, had a number of

years of sales experience within the ski advertising industry.  Defendant's Exhibit A-96.

62.    Given the facts above, I find that, from the evidence produced at trial, it is

reasonable to assume that SkiView would have, at a minimum, accomplished the same

results as Ripple achieved selling advertising to the clients originally secured by SkiView

in the second and third years of the Agreement.  See, e.g.,  *Uinta Oil*, 244 P.2d at

884-885.

63.    Therefore, I find that the evidence produced at trial shows that, at the

minimum, SkiView suffered a loss of gross revenue in the amount of $476,640.00 due

to the wrongful termination of the Agreement by Ripple.

64.    Under Colorado law, the proper measure of lost profits is net lost profits, not

gross revenue.  See  *Logixx*, 56 P.3d at 1227.

65.    The uncontested testimony at trial established that SkiView's expenses

associated with the sale of advertising for the Maplinks product, in years two and three

of the Agreement, would have amounted to $67,000.00.

66. Accordingly, deducting estimated expenses from estimated gross revenues, I find that $409,640.00 is a reasonable calculation of lost profits suffered by SkiView as a result of Ripple's breach of the Agreement.

67. It is my opinion that a damage amount of $409,640.00 is more than a fair calculation of SkiView's lost profits, as it is based upon actual results achieved through Ripple's sales to clients secured by SkiView, but it does not take into consideration a growth rate commensurate with SkiView's actual first year sales and continued promotion of the Maplinks Promotional Space.

68. In addition, the following testimony and evidence produced at trial supports the determination that $409,640.00 is a fair calculation of SkiView's lost profits:

    a.     The influx of cash into SkiView through the sales of its assets to Keeplan would have given SkiView more capital in which to use its business to pursue customers for the Maplinks product in years two and three of the Agreement;

    b.     The experience and track record of SkiView sales persons;

    c.     SkiView's experience in the marketing and sales of advertisements to ski resorts;

    d.     SkiView's pre-existing relationships with a number of national advertisers;

    e.     The number of sales calls SkiView had already initiated for the second year of the Agreement prior to its termination;

    f.     In years two and three of the Agreement, Ripple secured additional chairs (an additional 1318 chairs) at additional mountains (Crested Butte, Copper

Mountain, Winter Park, Mammoth, and Telluride) upon which SkiView

could offer advertising to potential customers;

g.    Ripple increased the price of advertisements per chair from $600.00 to, at

the very least, $750.00 per chair during years two and three. Defendant's

Exhibit A-40;  Defendant's Exhibit B-11.

69.  I further find that, under Colorado law, SkiView is not entitled to

pre-judgment interest.  Under Colorado law, a plaintiff must make a demand for interest

in his or her complaint.  As stated in *Clark v. Hicks*, 252 P.2d 1067, 1070 (Colo. 1953)

(en banc), "Plaintiffs not having demanded interest prior to the entry of judgment,

waived this demand which the statute provides must be made in the complaint."

Though this strict requirement has been somewhat loosened -- *see, e.g., Colorado*

*Performance Corp. v. Mariposa Assocs.*, 754 P.2d 401, 410 (Colo.App. 1988)

("plaintiffs' request for 'interest' in their amended complaint was a sufficient request for

an award of pre-judgment interest under the statute to permit an award of the same") --

Colorado law still requires that a plaintiff make at least a minimal demand for, or

reference to, "interest."  *See generally J. Kent Miller, Recovery of Interest: Part I --*

*Personal Injury*, 18 Colo. Law. 1063, 1064 (June 1989) ("Pre-judgment interest is not

automatically awarded -- it must be requested.  Colorado has moved from a restrictive

interpretation of this requirement to a much more liberal construction in which almost

any mention of the word 'interest' will be sufficient to allow recovery.").  Further, the

plaintiff is not allowed to amend his complaint under FED. R. CIV.P. 59(e) to seek interest

after the verdict is returned.  *Clark*, 761 P.2d at 268-69.

15

70.  After careful examination of the Defendant's Answer and Counterclaims, I find that Defendant did not request interest in its Counterclaims.

71.  However, I find that SkiView is entitled, under Colorado law, to post-judgment interest at 8% from the date of judgment until the time that the judgment is satisfied.  Colo. Rev. Stat. §5-12-102(4)(b).

72.  I also award costs to be paid to SkiView pursuant to their offer of Judgment in the amount of $325,000.00 which was hand delivered to Ripple on July 3, 2008.  As SkiView has recovered in excess of $325,000.00, SkiView is entitled to have all its litigation costs incurred in this case from July 3, 2008 to the present reimbursed by Ripple.  Fed. R. Civ. P. 68.

73.  As to the issue of attorneys' fees and costs prior to the offer of Judgment, Colo. Rev. Stat. §13-17-102(2) states that a court shall award attorneys' fees and costs to a party who has to defend against a lawsuit which the court determines lacked "substantial justification."  See also, *Harrison v. Luse*, 760 F.Supp. 1394, 1400 (D. Colo. 1991)

74.  A lawsuit lacks substantial justification when it is substantially frivolous, substantially groundless, or substantially vexatious.  Colo. Rev. Stat. §13-17-102(4).

75.  Under Colorado law, a claim is frivolous when the proponent can present no rational argument based on the evidence or the law to support the claim or defense. *Western United Realty, Inc. v. Isaacs*, 679 P.2d 1063, 1069 (Colo. 1984);  *Harrison*, 760 F. Supp. at 1400.

76.  Colo. Rev. Stat. §13-17-103(1)(a)-(h) sets for factors that a court shall

consider in determining whether to award attorneys' fees and costs. The list of factors

is not exclusive. See Colo Rev. Stat. §13-17-103(1). Generally, the factors utilized in

assessing the frivolousness or groundlessness of an action include: (1) the extent of the

efforts made by a party to determine the validity of its claim before making the claim or

before trial, (2) whether the claim was prosecuted in bad faith or the party abused

discovery procedures, and (3) whether the evidence of issues of fact was conflicting.

See *Harrison*, 760 F.Supp. at 1400.

77. I find that SkiView is not entitled attorneys' fees and costs prior to the Offer

of Judgment as Ripple's claims were not substantially frivolous, substantially

groundless, or substantially vexatious.

78. I find that the evidence produced at trial demonstrated that Ripple had a

reasonable belief under the circumstances and under the law that SkiView was in

breach of contract.

79. Additionally, I find that Rule 11 Sanctions are not appropriate as well. Fed.

R. Civ. P. 11 also allows me to impose the sanction of attorneys' fees and costs for

claims brought in federal court when the claims were "not formed after an inquiry

reasonable under the circumstances and warranted by existing law or a rational

argument to change the law." *Forgacs v. Eye Care Center of Northem Colorado*, 2007

WL 552239 *2 (D. Colo. Feb. 20, 2007)(internal quotations omitted). I find no violation

of Rule 11 before me.


II. CONCLUSION

In light of the foregoing findings of fact and conclusions of law, I enter Final Judgment in favor of Defendant SkiView Corporation as follows:

IT IS ORDERED that Judgment shall enter on Plaintiff's Amended Complaint in favor of Defendant SkiView Corporation.  Plaintiff shall take nothing by its claims.  It is

FURTHER ORDERED that Judgment shall enter on Defendant's Counterclaims in favor of Defendant SkiView Corporation in the amount of $409,640.00.  It is

FURTHER ORDERED that post-judgment interest shall accrue at the rate of 8% from the date of judgment until satisfaction of the judgment.

Dated:  October 20, 2008

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge